PAUL G. LIEDERBACH v. E. N. PICKETT AND OTHERS.[1]

No. 31,041.

April 30, 1937.

*H. S. Whipple,* for appellants.
*Henry Spindler,* for respondent.

LORING, JUSTICE.

This was an action brought to determine the boundary between village properties, alleged to be contiguous, lying in block 67 of the replat of the village of Buffalo. The plaintiff prevailed in the court below, and the defendants come here upon an appeal from an order denying their motion for a new trial.

[1]Reported in 273 N. W. 77.

Defendants make two principal contentions. First, they claim an estoppel *in pais* against the plaintiff in favor of a line run by an engineer named Jude which includes upon their own property the buildings which they have erected or moved thereon. Second, they contend that the true boundary is more favorable to them than that found by the court.

Plaintiff's holdings lie southerly from defendants'. Three lines were run by as many engineers or surveyors. The most northerly line was run by Nickerson, a line 10 to 13 feet southerly of that was run by Higgins, and about 10 feet further to the south is the line run by Jude, which defendants claim was established and pointed out to them in the transaction of purchase. The Higgins line, as we refer to it, is the line claimed to be correct by defendants in case it is found that they are not entitled to the Jude line under the doctrine of estoppel *in pais*. (There was another line run by Higgins only a foot or two distant from the Nickerson line. It is the Higgins line 10 to 13 feet distant from the Nickerson line which we designate herein as the Higgins line.)

The plat of block 67 by the original dedicators did not divide the land within that block into lots. Subsequently a lot A was platted within block 67 and ultimately came to the ownership of the plaintiff. North of this lot A and within the boundaries of block 67 lies the tract which the defendants purchased under contract from the plaintiff and his cotenants, Dr. Lowe and two others who were apparently nonresidents of the village of Buffalo.

For an indefinite period prior to May, 1934, the defendants had engaged in operating a roadside popcorn and lunch wagon, first in the street contiguous to lot A, then close to the plaintiff's garage upon said lot with the permission of the plaintiff's lessee. The popcorn wagon first stood upon wheels and later upon some sort of a block foundation. The defendants had constructed a small bunkhouse upon lot A near by. The plaintiff, prior to defendants' occupancy of this part of the lot, operated a garage on the southerly portion of it but had leased the garage and had removed to the city of Minneapolis, where he conducted a trucking business which

frequently took him past this property in the village of Buffalo. Plaintiff's removal from Buffalo apparently left Dr. Lowe as the only one of the four cotenants of the property contracted to the defendants, who still resided in Buffalo. The sale under contract to the defendants originated in an offer made by them to Dr. Lowe to purchase the tract for $150. Upon Dr. Lowe's communication of this offer to his cotenants, he was intrusted with all the negotiations with the defendants, and these negotiations resulted in an agreement upon a price of $220 for the tract. Dr. Lowe testified that in consideration of the terms which he had made with the defendants he would furnish them a contract and see that the line now in dispute was established. The doctor testified that he got in touch with his associates,—

"and they give me to understand that I could go ahead and make whatever deal that I could with them [defendants], which I did. Then the contract was drawn up. And on or about that time they asked for an abstract and to locate the line for them. And I didn't know. I hadn't any abstract but I agreed to get one and find out where the line was. And I thought perhaps Mr. Liederbach would know and I tried to get him to come up sometime when it would be convenient and point it out to us if he could. I also told the Picketts that if he didn't come pretty soon, why, I'd try and get somebody to find it for us, and I asked Mr. Jude if it would be possible for him to run that line out for me. * * * So one day when I was going home his road crew, engineers, were there working on it. So I stopped and—they surveyed out the lot according to the description in the contract. And it didn't seem—

Q. "That is, the contract between you folks and the Picketts?

A. "Yes, that was the—a copy of the deed that we four people had had originally. And he came—Mr. Jude himself, I understood, came later and found a different line. That I don't know anything about, but it was pointed out on a sidewalk as his line. I says, 'That isn't—that isn't it, I'm sure.' And it didn't agree with the line that the boys run out according to that description, and I don't

know where Mr. Jude started from or anything about that but it didn't agree with the other."

Plaintiff's counsel then inquired of the doctor if he could recall the date when the Jude survey was made, but he could not recall the exact date although he testified that a considerable part of the purchase price had then been paid. According to the contract, $40 was to be paid on or before June 1, 1934, the balance on or before November 1, 1934. But according to the receipts given by Dr. Lowe, $60 was paid first on June 18, 1934, and on July 18 and August 4, 1934, $160 was paid. The defendants testified that plaintiff was present at Buffalo at a conversation between themselves and Dr. Lowe in which Dr. Lowe requested the plaintiff to come up when the Jude survey was run to help establish the line but that plaintiff refused to be there and said the matter "was up to" the doctor. Plaintiff denies being present at this conversation, but the record is conclusive that the doctor had charge of the negotiations with the defendants. After the Jude survey was run nothing further was done to establish the true line between these properties until after these proceedings were taken.

During the summer of 1934 defendants allowed their lunchroom and bunkhouse to remain near plaintiff's garage without attempting to move it upon the property which they had bought. This inaction on their part resulted in two letters (July 25 and September 6) from the plaintiff asking them to move their structures onto the land which they had purchased. Later on he shoved one of the buildings northerly a couple of feet by pushing it with his truck. Plaintiff reasons that the Jude survey was not made until after these notices were sent, but his testimony developed the fact that he had no personal knowledge whatever of the time when the Jude survey was made. The defendants testified that the Jude survey was made while the negotiations were being had and before any of the money was paid, and they also testify, and it is undisputed, that they moved their buildings north of the Jude line after plaintiff's second letter, and that they spent approximately $500 in fixing up and improving the buildings and lots, relying upon the Jude

line. It appears conclusively that Dr. Lowe agreed to have the line established, got Jude to run it, and after it was run by Jude took no steps to correct it if he believed it inaccurate.

Such being the case, we think that as a matter of law the defendants established their defense of an estoppel *in pais* against the plaintiff and that the evidence compelled a finding to that effect. Therefore we need not go into a discussion of the second defense.

The order appealed from is reversed and the case remanded with directions to amend the findings and conclusions and enter judgment in accordance with the views herein expressed.

PETERSON, JUSTICE (dissenting).

The court below made findings that an estoppel was not proved and that the Nickerson line is the true and correct line between the properties of plaintiff and defendants.

■ The findings of fact of the court below are entitled to the same weight as the verdict of a jury. The rule applies to inferences from undisputed facts. Findings are not to be disturbed unless the evidence, taken as a whole, furnishes no substantial support for them. 1 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934) § 411; Haedge v. Gaver, 173 Minn. 207, 217 N. W. 109; Sommers v. City of St. Paul, 183 Minn. 545, 551, 237 N. W. 427, 430, in which, in the consideration of written or documentary evidence, it was said that the rule applies "even if this court might be inclined to draw different inferences"; Waldron v. Page, 191 Minn. 302, 253 N. W. 894; S. Bader & Sons v. Gensler, 191 Minn. 571, 255 N. W. 97. Our inquiry should be whether there is evidence to sustain the findings made below. If this inquiry is answered in the affirmative, there should be an affirmance in this case.

■ I am unable to agree that there has been an estoppel *in pais*. After a painstaking consideration of the evidence, I am of the opinion, like the court below, that the defendants failed to prove an estoppel, either by representation or by conduct. An estoppel *in pais* may be said to arise in a case in which one party induces another to enter into a transaction (1) by a representation of fact,

or conduct which induces a belief as to the existence of the fact, (2) which the other party, having the right to do so, relies upon in the belief of the truth of such fact, and (3) is thereby deceived to such an extent that to permit a denial of the truth of the fact represented to exist, or believed by reason of the inducement to exist, would prejudice him. In Western Land Assn. v. Banks, 80 Minn. 317, 83 N. W. 192, Mr. Justice Calvin L. Brown stated that if any one of these essentials be lacking there can be no estoppel. 2 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934), §§ 3185, 3209.

This case seems to lack every essential of an estoppel. In the first place, there was no representation by the plaintiff as to the location of the so-called Jude line. Plaintiff did not make such a representation personally. If he did not make it personally, it could be made by him only through an agent authorized by him to make such a representation. The evidence shows that the only agent that plaintiff had was Dr. Lowe. His agency was confined to negotiating a contract for the sale of the property owned in common by plaintiff, Dr. Lowe, and others. Such an agency does not empower the agent to transact any business except with respect to the property in which the parties were jointly concerned. It does not authorize him to act with respect to separate property of a principal in which the others had no interest. Gilbert v. How, 45 Minn. 121, 47 N. W. 643, 22 A. S. R. 724. Lowe had no authority to fix any line encroaching upon the separate property of the plaintiff. The evidence shows that Dr. Lowe personally did not make any representation as to the location of the so-called Jude line. There were two so-called Jude lines, one of which was run by Jude's men, who pointed out to Mrs. Pickett the line which they had run. Later, Jude ran a line himself which he pointed out to Mr. Pickett and Earl Pickett. All the Picketts claim that their reliance was upon these lines. The evidence does not show that all the Picketts relied upon the same line. This is left in uncertainty.

But Jude was not authorized by Dr. Lowe to fix the boundary between the land embraced within the contract and the Liederbach property. The testimony conclusively shows that Dr. Lowe

asked Jude "to run that line out for me," that is, for Dr. Lowe. The employment of a surveyor to survey a boundary line does not constitute the surveyor an arbitrator to establish boundaries. Such a survey itself does not create an estoppel. Spring v. Hewston, 52 Cal. 442; Liddle v. Blake, 131 Iowa, 165, 105 N. W. 649; in Huff v. Woosley (Ky.) 92 S. W. 572, it was held that a survey locating a disputed line made under an employment by the parties is not binding on them. In such a case neither party is bound by the action of the surveyor unless the parties have in fact constituted the surveyor an arbitrator with powers to fix the boundary. The mere running of a survey by Jude and by Jude's men did not in itself locate the line between plaintiff's and defendants' property and did not create an estoppel. In Ward v. Dean, 69 Minn. 466, 72 N. W. 710, it was held that a line run by a surveyor employed by defendant did not establish the boundary line to her land and that plaintiff, who bought a part of the land relying upon the line run by the surveyor, could not claim an estoppel as against the defendant because the defendant had not represented to plaintiff, as an inducement to the purchase of the land, that the line run by the surveyor was the true boundary line. It was expressly held that in order to constitute an estoppel there must be a representation that the line run by the surveyor is the true boundary line, and the representation must have been made as an inducement to the purchase of the land by the person relying upon it.

The elements of inducement by representation and reliance thereon are wholly wanting in this case. The evidence supports a finding that the Jude surveys were made after the contract for the purchase of the land was signed by the parties and part, if not all, of the purchase price had been paid by defendants. This being so, the survey was not an inducement for entering into the contract nor can it be said that the defendants relied upon it in so doing. The rule is well settled that if a representation is made with respect to land after a contract for the purchase of the same has been signed, such representation does not constitute an estoppel. In such a case the representation is not an inducement to enter into

the contract, nor can the party to whom the representation is made say that he relied upon it in entering into the contract. Western Land Assn. v. Banks, 80 Minn. 317, 83 N. W. 192. It is not disputed that the contract was executed some time in May, 1934, and that the purchase price was $220, of which $60 was paid on June 18, 1934, $100 on July 18, 1934, and $60 on August 4, 1934. For three or four years prior to the execution of the contract, the defendants had occupied portions of lot A as subtenants and licensees of the plaintiff. One of the reasons that defendants purchased the land was that plaintiff wanted them to get off his property and occupy property belonging to them. After the contract was signed, plaintiff served two notices on them to get off his property, one on July 25, 1934, before the last payment of the purchase money had been paid, and one on September 6, 1934, after the purchase money had been paid in full. Plaintiff contends that the Jude surveys were made after the notice of September 6 was sent to defendants. He said that he did not see the survey made but he saw the stakes of a survey, which the defendants now claim was the Jude survey. Plaintiff testifies that these stakes were placed on the land some time after September 6, 1934. Dr. Lowe testified that the Jude survey was made after a considerable part, if not all, of the purchase price had been paid by defendants. Mrs. Pickett, one of the defendants, testified that the Jude survey was made sometime in the fall, and that it was some time after the contract was signed but she could not say how long. Her testimony on this point is as follows:

Q. "Now, Mrs. Pickett, when Jude was there doing some surveying, that was in the fall?

A. "I think so.

Q. "Yes. It was long after the contract was made, that is, it was long after the contract was signed up?

A. "What do you call long? I don't know what you'd call long.

Q. "Well, it was several months after the contract was signed up?

A. "Oh, no.

Q. "Well, a considerable while, quite a number of weeks?

A. "Well, it was awhile but I couldn't say how long. It wasn't—."

Mrs. Pickett claimed that the purchase money was paid after the survey. She further testified that she was unable to state whether the survey was in September or October but that it was late in the summer anyway. If her testimony is to be believed, the survey was made subsequent to the time when the admitted facts show that the contract had been signed and the purchase money paid thereunder. Her testimony confirms the claims of plaintiff and Dr. Lowe. This testimony is disputed by two witnesses, the defendants Ben Pickett and Earl Pickett. Ben Pickett testified that the survey was made before the contract was signed and the purchase money paid. He testified that he did not know when the survey was made. When asked, he was unable to state whether the survey was made late in the summer or in the fall. The defendant Earl Pickett testified that Mr. Jude surveyed the line before the contract was signed. The evidence fully sustains the finding of the court below that the estoppel was not proved. If a finding of estoppel had been made upon this evidence, we would have the very serious question of whether such a finding is justified by the evidence. At any rate, the weight of the evidence is against the estoppel. It is to be remembered too that the burden of proving an estoppel rested upon the defendants as the parties claiming it. Stammers v. Larson, 142 Minn. 240, 171 N. W. 809; Grant County State Bank, by Veigel, v. Schultz, 178 Minn. 556, 228 N. W. 150. Defendants failed to sustain the burden of proving the estoppel.

Regardless of when the Jude survey was made, the defendants were not justified in relying upon it. The alleged representation that the Jude survey located the boundary line is said to have resulted from a conversation between plaintiff and Dr. Lowe. For example, Mrs. Pickett testified:

Q. "Did you hear any talk yourself personally between Mr. Liederbach and Doctor Lowe in regard to the making of a survey?

A. "Yes.

Q. "You yourself heard that conversation?

A. "Yes.

Q. "When did that conversation take place?

A. "Well, I can't tell just when it was but it was a day before it was surveyed for us.

Q. "What was that conversation?

A. "Well, he asked Liederbach if he was going to be busy the next day. Liederbach was there and he asked him if he was going to be busy the next day and—no, he said, he didn't think so, wasn't anything. And—well, then, Mr. Lowe he says, 'I'm going to have this surveyed tomorrow afternoon,' he says, 'and you better come down,' he says, 'and see it surveyed.' And he said, 'Well, no, I'm not going to be busy but I won't be down.' "

It is apparent from the conversation that the defendants were not parties to it; that no reference was made to Jude; and that nothing was said to indicate that the survey would finally and definitely fix the boundary. About the time the contract had been entered into, Dr. Lowe agreed to "find out where the line was." Certainly defendants had no right to rely upon any line except one which Dr. Lowe might later point out to them as the line. The line run by the surveyor would not be that line until it was approved by Dr. Lowe and by him designated as the boundary line between the properties. In short, there was nothing in the conversation to justify the defendants in believing that they could rely upon the line to be surveyed without some action on the part of Dr. Lowe or plaintiff after the surveyor had located a line. There is absolutely no evidence that plaintiff or Dr. Lowe ever approved this line or pointed it out to defendants as the boundary line between the properties.

The conversation was not intended to influence the defendants at all. Rather, it was a discussion of the business of plaintiff and Dr. Lowe. In Combs v. Cooper, 5 Minn. 200, 212-213 (254), this court held that there can be no estoppel unless the representation is made with an express design to influence the action of the person to whom it was made. In this case the statement was not even

564

made to the defendants but, on the contrary, was made by Dr. Lowe to plaintiff in a conversation between themselves. In the cited case, Cooper, who was about to purchase a lot, had a conversation with Combs as to the division line. Combs pointed out a division line along which he said the former owner would build a fence. Cooper claimed an estoppel by reason of the fact that Combs had pointed out the boundary to him, alleging that he had purchased the property relying upon the representation. This court held that the representation would not form the basis of an estoppel because Combs did not know that Cooper was about to purchase the property, and consequently the representation was not made to influence him in purchasing it. In the instant case there is nothing to show that the conversation between plaintiff and Dr. Lowe was intended to influence the defendants or that plaintiff knew that defendants had knowledge of the conversation. If an estoppel can arise by reason of a party overhearing a conversation between coöwners of property, which was not intended for the ears of such party, it seems that every person engaged in business is subject to a peril in this respect to which there are no bounds. Why should not a person be estopped whose conversations are taken down on a dictagraph, or whose telephone wires are tapped, if the plaintiff is held to be estopped because the defendants eavesdropped on the conversation between plaintiff and Dr. Lowe? If there is an estoppel in the case at bar, there is an estoppel in every case suggested by the question.

Furthermore, it is to be remembered that Dr. Lowe did not approve the survey made by Jude. His testimony is that he asked Jude to locate the line for *him*. He found that Jude's men had run one line and that a few days later Jude had run another line and that the two lines did not agree. Dr. Lowe did not approve either line. As to the line run by Jude himself, Dr. Lowe testified that the line was pointed out to him on the sidewalk as the Jude line, and "I says, that isn't—that isn't it, I'm sure. And it didn't agree with the line that the boys run out according to that description, and I don't know where Mr. Jude started from or anything

about that but it didn't agree with the other." If the defendants were justified in acting on the survey of Jude or his men, which was not approved by Dr. Lowe, the man who hired him for himself and the other owners, including plaintiff, then every person employing a surveyor stands to lose his land by estoppel no matter how erroneous the survey may be, and even though the owner may not approve it. In short, a survey will be at the landowner's peril if an estoppel can arise in a case like this.

But it is claimed that an estoppel arises because the defendants were permitted to make improvements on plaintiff's land, believing that the land belonged to defendants, and that plaintiff stood by without making any complaint. It is not necessary to decide whether such a claim could be sustained as a legal proposition. It is sufficient for this case to say that the claim is not warranted by the facts. All the testimony shows that the improvements were made after the contract was signed and the purchase price was paid. The testimony is also clear that the improvements were made after plaintiff had ordered the defendants to get off his land. They were all made after September 6, 1934, with knowledge that plaintiff disputed their right to occupy the land on which the improvements were made. The plaintiff's testimony is clear upon this proposition. Mrs. Pickett testified that the buildings were moved and the improvements made, a short time after they received the notice of September 6, some time in September or August, she could not say which. The defendant Ben Pickett testified that they did not move the buildings during the summer because there were some vines, flowers, and shrubbery which they did not want to disturb by moving the buildings. He testified that the buildings were moved within 30 days after they got the letter, referring to the letter of September 6, 1934. The testimony of Earl Pickett is to the same effect. In short, the testimony of all the parties upon this point is that Liederbach claimed that the Picketts were trespassers, had ordered them off his property, that they did not go, and that in defiance of his ownership and notice to vacate they proceeded to make the improvements in question. The testimony not only shows

that there was a dispute between the parties and that the defendants acted at their peril, but also that plaintiff attempted forcibly to eject the defendants by driving his truck against their building and attempting to push it off his property. The present action was commenced on October 26, 1934, about seven weeks after the last notice to defendants to get off plaintiff's premises. What more plaintiff could have done to assert his rights to his property under the circumstances is hard to imagine. Certainly it cannot be said that the Picketts, in making the improvements, were not aware of the plaintiff's claims to his own property. They claimed the same property, and when they acted they acted at their peril, knowing that if the plaintiff's claims were sustained, the improvements they were making would be on plaintiff's property. Certainly this can give rise to no estoppel.

■ The evidence required the finding, made by the court below, that the true boundary line between plaintiff's property and that purchased by the defendants is the north line of lot A, as found by the Nickerson survey. Block 67 was formerly owned by one Jackson Taylor. The accompanying sketch shows block 67 and the various properties referred to.

Taylor did not divide the block into lots. He sold certain tracts thereof, described by metes and bounds. One tract at the southeast corner of the block was sold by describing it as a tract running 90 feet along the south line of the block, west from the southeast corner, thence north 142 feet, thence east 90 feet, thence south along the east line of the block 142 feet to the point of beginning. This is the Vorse property referred to on the sketch. He sold a strip off the north end of the block described on the sketch as the Pickett property. The point of beginning was taken from the southeast corner. The description, as given in the findings, reads:

"Beginning two hundred twenty-eight feet north of the southeast corner of said block sixty-seven; thence west ninety feet; thence south seventy-four degrees west to the west line of said block, excepting therefrom, however, the north ninety feet of said block sixty-seven, according to the plat of said block on file and of record

in the office of the register of deeds within for said county of Wright."

# BLOCK 67

SCALE ⊫⊫⊫⊫ FEET
0  12  24  36  48

Then lot A was laid out. The description of lot A begins at the southwest corner as the block was before the change was made in the street. This description is as follows:

"Beginning at the southwest corner of Block 67 of the amended plat of Buffalo, Wright County, Minnesota, and running thence northwesterly along the line of said block 94½ feet; thence north 76 degrees east 3½ feet for a starting point; thence north 76 degrees east 113½ feet; thence north one degree east 88½ feet; thence south 74 degrees west 142½ feet; thence south 15½ degrees east 80 feet to starting point, containing 22/100 acres, designated as Lot 'A' of block 67 on a plat made by H. T. Moland, county surveyor, October 7th, 1909."

By actual measurement, both upon the plat and upon the ground, the north line of lot A coincides with the south line of the so-called Pickett property insofar as the two properties are contiguous.

The balance of the property was part of the Jackson Taylor estate. This is designated on the sketch as the Josie Liederbach property. This was what remained after Jackson Taylor had sold and conveyed the properties which have been described. In describing this property in the final decree in probating the estate of Jackson Taylor, an error crept into the description of this property in giving the distance between the southwest corner of lot A and the southwest corner of block 67. As stated, the correct distance is 94½ feet. In the final decree in the Jackson Taylor estate the distance is given as 81½ feet. The property was assigned by the probate court to Rachel Taylor and was conveyed by her to one Keeler and by Keeler to Josie Liederbach. In all the conveyances the mistake in the final decree was repeated. In the final dcree and in each of the deeds it is apparent that this distance is not controlling because the so-called Josie Liederbach property was described in each of them as follows:

"Beginning at a point on the South line of said Block Ninety feet West of the Southeast corner thereof and running thence North parallel to Maple Street 142 feet, thence East Ninety feet to Maple Street, thence North 86 feet, thence West Ninety feet, thence South 74 degrees West 87 feet; thence South one degree East 88½ feet, thence South 76 degrees West 113 feet; thence South 15½

degrees East 81½ feet; thence East on the South line of said Block 155 feet to the place of beginning, containing one-half acre."

It is apparent from these descriptions that it was the intention to follow the lines around the Vorse property at the southeast corner, then up along the east line of the block to the so-called Pickett property, then along the south line of the Pickett property to lot A, then along the east line of lot A, then along the south line of lot A to the street and then along the street to the southwest corner of the block, and then along the south line of the block to the point of beginning. The distance between the southwest corner of lot A and the southwest corner of block 67 was erroneously stated. The southwest corner of lot A is on a line north 76 degrees east 3½ feet from the line of the old street, and the distance from that point along the line of the old street to the southwest corner of the block as it was before the street was changed is 94½ feet. The distance from the southwest corner of lot A to the southwest corner of the block as it is after the change in the street is 90 feet. Apparently an attempt was made, in describing the Josie Lieder-bach property, to take the distance on a straight line from the south-west corner of lot A to the new southwest corner of block 67. The distance was stated as 81½ feet in the final decree and conveyances of the Josie Liederbach property instead of 90 feet. This is clearly a mistake. Mr. Higgins, in making his survey, took the distance given in the Josie Liederbach deed—81½ feet—as being the distance from the southwest corner of block 67 before the change in the location of the street was made. He took the distance 81½ feet along the east line of the block to a point (without actually measuring the same) and thence north 76 degrees east 3½ feet to the starting point. This threw him off 13 feet. He then still had 13 feet to go to the intersection of the 3½-foot line to take him to the point of beginning.

An erroneous description of this kind yields to the other con-trolling calls in a description. Ingelson v. Olson, 199 Minn. 422, 272 N. W. 270. Therefore, the distance should have been taken as 90 feet along the line of the street with the change of location, and

570

94½ feet along the street before the change of location. Mr. Higgins, defendants' surveyor, did not actually measure this distance but took it from the instruments to which reference has been made and in which the distance is erroneously given.

Notwithstanding that the 81½ feet is an erroneous description, Mr. Higgins adopted it as the correct one. He therefore began at the southwest corner of the block and without an actual measurement determined that the southwest corner of lot A was 81½ feet from the southwest corner of the block, and ran the other distances on paper to correspond. He actually measured the south line of the Pickett property according to the description given, and it corresponded with the Nickerson survey of the same line. It must have been obvious to the court below that Higgins was in error in assuming that the 81½ feet was the correct distance. He called attention to this fact upon the trial. By moving lot A 13 feet south in the manner stated, it left a strip of land between lot A and the Pickett property 13 feet in width. This defendants' counsel erroneously calls a "No-Man's Land." If lot A is surveyed according to the true distances, it is contiguous to the Pickett property, and there is no such No-Man's Land. All the descriptions of lot A give the distance mentioned as 94½ feet. Jackson Taylor gave that distance when he platted the property. It is the description used in all of the conveyances of lot A. This distance was adopted by Jackson Taylor and his successors in title prior to the time that the so-called Josie Liederbach property was assigned by the probate court. The error, calling this distance 81½ feet instead of 94½ feet, occurs only in describing the Josie Liederbach property and not in describing lot A. How the error occurred does not appear from the record. It is obvious that the error relates not to the location of lot A and the lines by which it is bounded, but to the distance from the southwest corner of lot A to the southwest corner of the block in the description of the Josie Liederbach property. Furthermore, lot A having been located according to the correct description mentioned, it cannot be moved south 13 feet by errors in subsequent instruments. The title to lot A had already

passed from Jackson Taylor to plaintiff's predecessor. Jackson Taylor and his successors in title were powerless to change the location of lot A or the description of it. The probate court was powerless to do so. It seems to me that the trial court could not have done otherwise than find that the Nickerson line was the true line. The Higgins line obviously should have been rejected. If any other finding had been made it would be the duty of this court to reverse.

For the reasons stated, we should affirm.

MR. CHIEF JUSTICE GALLAGHER, not having been a member of the court when this case was argued and submitted, took no part in its consideration or decision.

MR. JUSTICE STONE took no part in the consideration or decision of this case.

OPINION SUPPLEMENTING ORDER DENYING PETITION FOR REHEARING.

On June 18, 1937, the following opinion was filed:

PER CURIAM.

The opinion does not preclude the trial court from providing for the determination of the exact location of the "first Jude line" referred to in the opinion as established by estoppel *in pais*.